# STATE OF MICHIGAN

# COURT OF APPEALS

DANIEL BERG,

Plaintiff-Appellant,

v

NUNZIO MUNOZ, a/k/a NORBERTO MUNOZ,
REBECCA BERG, and CATHERINE BERG,

Defendants-Appellees.

UNPUBLISHED
July 23, 2015

Nos. 321162; 321645
Newaygo Circuit Court
LC No. 12-019815-NZ

Before: SERVITTO, P.J., and BECKERING and BOONSTRA, JJ.

PER CURIAM.

In docket no. 321645, plaintiff, Daniel Berg, appeals as of right the trial court's April 14, 2014 order granting summary disposition under MCR 2.116(C)(10) to defendants, Nunzio Munoz, a/k/a Norberto Munoz, Rebecca Berg, and Catherine Berg. In docket no. 321162, plaintiff appeals as of right the trial court order granting defendants' motions for attorney fees. We affirm in part, reverse in part, and remand for further proceedings.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

These consolidated cases[1] arise out of a bitter family dispute regarding the operation of a farm originally owned by Melvin Berg. Daniel, Melvin's son, claimed various contracts with Melvin regarding the operation of the farm. Daniel alleged that his two youngest sisters, Rebecca and Catherine, along with Munoz, Rebecca's boyfriend, tortiously interfered with those contracts and that they converted his property. It appears undisputed that at some point, Daniel worked on Melvin's farm and performed various activities either on behalf of Melvin or with Melvin's blessing. However, Daniel ceased working on the farm in March 2012 after Melvin obtained a personal protection order (PPO) against him. It is undisputed that the PPO was not prepared in Melvin's handwriting, but it contained his signature. The PPO was subsequently dismissed, but in its place, a civil injunction was entered that prohibited Daniel from entering Melvin's farm. The injunction also provided that cattle on the farm were to be sold, with the

---

[1] We entered an order consolidating the appeals on June 6, 2014. *Berg v Munoz*, unpublished order of the Court of Appeals, entered June 6, 2014 (Docket Nos. 321162; 321645).

-1-

profits given to Melvin, and that the remaining cows were to be fed with silage or other crops that were stored on the farm.

Daniel's banishment from the farm prompted the instant litigation. He filed a complaint against defendants and alleged tortious interference with various purported contracts for the planting and harvesting of corn, soybeans, silage, and wheat; for the lease of Melvin's farm fields; for the care of the cattle located on Melvin's farm; for Daniel to be allowed to recoup his expenses from operating Melvin's farm; and for Daniel to receive a share of the profits from Melvin's farm in the form of wages. Daniel also raised 10 counts of statutory conversion against defendants based on allegations that they converted wheat, silage, corn, hay (two separate claims), soy meal, cattle, fuel, potatoes, and a tarp present on Melvin's farm.

Following the close of discovery, defendants moved the trial court for summary disposition under MCR 2.116(C)(10) and for attorney fees under MCR 2.114(E) and (F). Regarding the summary disposition motions, the trial court eventually found that Daniel failed to present evidence of the alleged oral contracts with Melvin because there was an "absence of the parameters" of a contract. The trial court also determined that there was no evidence of interference with the alleged contracts by defendants. In particular, the trial court rejected Daniel's argument that defendants interfered with any contract, finding that while the statements in the affidavits Daniel submitted to the trial court indicated that defendants told Melvin bad things and influenced Melvin's relationship with his children, the statements in the affidavits did not indicate that defendants made statements regarding contracts between Melvin and Daniel. Regarding Daniel's conversion claims, the trial court found "we don't even know what's missing at this particular point in time. There's certainly no, nothing in the allegation -- other than allegations to indicate that Catherine Berg or Norberto Munoz or Rebecca Berg ever took anything." Based on those findings, the trial court concluded that it would grant defendants' motions for summary disposition in regard to Daniel's tortious interference with a contract and statutory conversion claims.

Subsequently, the trial court ruled on defendants' motions for sanctions. The court ruled that it "had previously determined these cases to be frivolous particularly at the time when I, from the Bench, gave an opinion relative to granting the Motion for Summary Disposition." The trial court stated that plaintiff's claims of tortious interference with a contract were frivolous because "basically . . . there was no contract" and there were no allegations that defendants specifically interfered with a contract between Melvin and plaintiff.

On March 12, 2014, the trial court entered an order granting defendants' motions for sanctions "in its entirety" and awarding $30,906.35 in attorney fees to Catherine and $27,839.75 in attorney fees to Munoz and Rebecca. On April 14, 2014, the trial court entered an order granting defendants' motions for summary disposition.

## II. SUMMARY DISPOSITION

### A. STANDARD OF REVIEW

Daniel argues on appeal that the trial court erred in granting defendants summary disposition under MCR 2.116(C)(10) in regard to his eight tortious interference with a contract

claims and his 10 statutory conversion claims. Under MCR 2.116(C)(10), summary disposition of all or part of a claim or defense may be granted when "[e]xcept as to the amount of damages, there is no genuine issue as to any material fact, and the moving party is entitled to judgment or partial judgment as a matter of law." "A motion under MCR 2.116(C)(10) tests the factual sufficiency of the complaint." *Maiden v Rozwood*, 461 Mich 109, 120; 597 NW2d 817 (1999). Thus, in reviewing a motion for summary disposition pursuant to MCR 2.116(C)(10), we must "determine whether there exists a genuine issue of material fact on which reasonable minds could differ or whether the moving party is entitled to judgment as a matter of law." *Gibson v Neelis*, 227 Mich App 187, 190; 575 NW2d 313 (1997). The grant or denial of summary disposition under MCR 2.116(C)(10) is reviewed de novo to determine if the moving party is entitled to judgment as a matter of law. *Maiden*, 461 Mich at 118.

## B. TORTIOUS INTERFERENCE

Regarding Daniel's tortious interference with a contract claims, "[t]he elements of tortious interference with a contract are (1) the existence of a contract, (2) a breach of the contract, and (3) an unjustified instigation of the breach by the defendant." *Knight Enterprises v RPF Oil Co*, 299 Mich App 275, 280; 829 NW2d 345 (2013) (citations and quotation omitted). Here, assuming without deciding that Daniel produced evidence for each of his alleged contracts with Melvin,[2] we nevertheless agree that summary disposition in favor of defendants was warranted because there was no evidence of an unjustified instigation of the breach, i.e., tortious interference with those contracts, by defendants.

The last element of a tortious interference claim—unjustified instigation of the breach—requires a plaintiff to "allege the intentional doing of a per se wrongful act or the doing of a lawful act with malice and unjustified in law for the purpose of invading the contractual rights or business relationship of another." *CMI Intern, Inc v Intermet Intern Corp*, 251 Mich App 125, 131; 649 NW2d 808 (2002) (citation and quotation omitted). "A 'per se wrongful act' is an act that is inherently wrongful or one that is never justified under any circumstances." *Formall, Inc v Community Nat'l Bank of Pontiac*, 166 Mich App 772, 780; 421 NW2d 289 (1988). Not only must an act be "per se wrongful," but the plaintiff must also demonstrate that the act was done with the intention of inducing a breach of the contract. *Badiee v Brighton Area Sch*, 265 Mich App 343, 368; 695 NW2d 521 (2005). On the other hand, "[i]f the defendant's conduct was not wrongful per se, the plaintiff must demonstrate specific, affirmative acts that corroborate the unlawful purpose of the interference." *CMI Intern, Inc*, 251 Mich App at 131. "In other words, the intentional act that defendants committed must lack justification and purposely interfere with plaintiffs' contractual rights . . . ." *Advocacy Organization for Patients & Providers v Auto Club Ins Ass'n*, 257 Mich App 365, 383; 670 NW2d 569 (2003).

---

[2] Daniel admits that none of the alleged contracts were ever in writing. We question whether the facts alleged in the various affidavits submitted by plaintiff contain enough detail to demonstrate that these oral contracts even existed. However, we do not decide the matter on this issue, as we find no evidence of tortious interference by defendants.

In addressing this claim, we note that in Daniel's response to defendants' respective motions for summary disposition, he produced numerous affidavits from various family members; however, those affidavits fall short of demonstrating the requisite interference with the alleged contracts. We briefly address those affidavits, summarize their contents, and explain why they fail to make the requisite showing of an unjustified breach of the alleged contracts occasioned by defendants.

Daniel produced numerous affidavits, including those from Nora Priante, Nancy Morin, his son, Daniel Berg II (Daniel II), Holly Haack, Diane Tibbs, Maria Gloria Berg, and others, who averred that it was "common knowledge" that he, Daniel, was running the family farm at all times pertinent to the allegations. These affidavits also contained various averments that defendants were aware of an agreement or agreements between Daniel and Melvin concerning the operation of the farm. However, statements regarding whether Daniel had some type of agreement that pertained to operating the farm fail to show any interference by defendants.

Daniel also produced affidavits from several of his relatives, including those noted above, alleging that Catherine, Rebecca, Munoz, or some combination thereof had some sort of effect on Melvin or that they spent time around him and that they could have had an opportunity to influence him. For instance, some relatives averred that when Melvin was around Rebecca, he was less talkative. Daniel averred that Catherine visited Melvin "weekly" for a period of time and *could have* influenced him during that time. Such averments do not create a question of fact with regard to whether defendants tortiously interfered with any agreements that Melvin may or may not have had with Daniel. They are simply speculation as to *why* Melvin was less talkative at times and as to whether Catherine or other defendants *could have* influenced Melvin in some fashion that may or may not have been related to Daniel's alleged contracts with Melvin. Mere conjecture or speculation is insufficient to establish a genuine issue of material fact for trial. *Libralter Plastics, Inc v Chubb Group of Ins Cos*, 199 Mich App 482, 486; 502 NW2d 742 (1993). Additionally, with regard to claims that defendants may have had some type of effect on Melvin, we note that Daniel II's affidavit included a statement that Melvin "confided" in him that Munoz and Rebecca indicated to Melvin that Daniel was doing a bad job of running the farm. However, "[o]pinions, conclusionary denials, unsworn averments, and inadmissible hearsay do not satisfy the court rule; disputed fact (or the lack of it) must be established by admissible evidence." *Palazzola v Karmazin Prod Corp*, 223 Mich App 141, 155-156; 565 NW2d 868 (1997) (citation and quotation omitted). Any statements that Melvin—who is not a party to this action—may have made are inadmissible hearsay. See MRE 801(c) (" 'Hearsay' is a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."). Such statements could not be used to demonstrate a genuine issue of material fact. In regard to statements, we also note that plaintiff directs our attention to a statement in Haack's affidavit that Rebecca once told her[3] that she could "convince Dad [Melvin] to do anything I want." There is no context for this statement, other than that it was made approximately four years before the alleged breaches of the contract.

---

[3] Rebecca's own statement would be admissible as the admission of a party-opponent. See MRE 801(d)(2).

In addition, the statement, while showing that Rebecca believed she could convince Melvin to do her bidding, does not contain any reference to farm-related activities or any agreements between Melvin and Daniel. Nor has Daniel supplied such a link, beyond his own speculation, which is insufficient for purposes of a motion for summary disposition. See *Libralter Plastics*, 199 Mich App at 486.

We also note, as does Daniel's brief on appeal, that many of the affidavits submitted before the trial court noted that Rebecca, at various times throughout the years, placed papers in front of Melvin to sign and did not permit Melvin to read the documents. Aside from the fact that some of the claims pertained to incidents that occurred in 2009 and bore no relationship to the instant allegations, we note that implicit in Daniel's argument is an invitation to speculate that within the documents Rebecca placed before Melvin was the PPO that ultimately led to Daniel's banishment from the farm. We decline that invitation, as Daniel has failed to set forth any evidence to support his claim, and instead resorts to speculation and conjecture. See *id.*

Lastly, we address Daniel's arguments that various statements defendants made in front of Melvin, provided evidence of tortious interference. We note that Daniel's affidavit stated that on "March 18, 2013,"[4] Catherine, in front of Melvin, accused Daniel of stealing from Melvin. The affidavit does not contain any indication whether Melvin, who, per affidavits, was hard of hearing, heard this allegation. Nor does Daniel's 26-page affidavit expressly refute the allegation. Moreover, there is no indication that the statement was made for the purpose of inducing Melvin to breach his alleged contracts with Daniel. As is often the case with Daniel's arguments, he relies on speculation—speculation that Melvin heard the statement and that the statement was intended to induce a breach. Such speculation and conjecture cannot suffice to survive a motion for summary disposition. See *id.* We also reject Daniel's assertion that statements by one or more defendants that Daniel did not know what he was doing with regard to farming, and/or that Munoz could operate the farm for Melvin, could show tortious interference by defendants. Such statements of opinion based on Daniel's competency or lack thereof do not rise to the level of conduct that was wrongful per se, nor do they amount to the intentional doing of an act with malice done for the purpose of invading Daniel's contractual rights. See *Advocacy Organization for Patients & Providers*, 257 Mich App at 383.

In sum, defendants were entitled to judgment as a matter of law regarding each of Daniel's tortious interference with a contract claims because there was no evidence that defendants unjustifiably instigated or induced Melvin to breach the alleged contracts in this case. See *Knight Enterprises*, 299 Mich App at 280; *CMI Intern, Inc*, 251 Mich App at 131. The trial court did not err in granting defendants summary disposition under MCR 2.116(C)(10) as to each of those claims. *Maiden*, 461 Mich at 118.

---

[4] Daniel was banned from the farm in approximately March of 2012. We question the significance of an event that happened one year after that, in March of 2013. However, and to give Daniel the benefit of the doubt, we will assume that the affidavit was mistaken and that it meant to refer to an incident in March 2012, not March 2013.

## C. STATUTORY CONVERSION

Turning to Daniel's statutory conversion claims,[5] MCL 600.2919a(1) provides:

> (1) A person damaged as a result of either or both of the following may recover 3 times the amount of actual damages sustained, plus costs and reasonable attorney fees:
>
> (a) Another person's stealing or embezzling property or converting property to the other person's own use.
>
> (b) Another person's buying, receiving, possessing, concealing, or aiding in the concealment of stolen, embezzled, or converted property when the person buying, receiving, possessing, concealing, or aiding in the concealment of stolen, embezzled, or converted property knew that the property was stolen, embezzled, or converted.

Conversion, is typically understood, in the common law, as "any distinct act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein." *Aroma Wines & Equip, Inc v Columbian Distrib Servs, Inc*, __ Mich __; __ NW2d __ (Docket Nos. 148907; 148909, issued June 17, 2015), slip op at 15. Statutory conversion under MCL 600.2919a(1)(a) refers to "a subset of common-law conversions in which the common-law conversion was to the other person's 'own use.' " *Id.* at 18. Under the statute, "own use" means that the property "must be used for a purpose personal to the converter." *Id.* at 22. This requires that a plaintiff alleging statutory conversion demonstrate "that the defendant employed the converted property for some purpose personal to the defendant's interests, even if that purpose is not the object's ordinarily intended purpose." *Id.* In addition, to raise a meritorious conversion claim, the plaintiff must have an enforceable interest in the property at issue at the time of conversion. *Thomas v Watt*, 104 Mich 201, 207; 62 NW 345 (1895) (holding that a plaintiff must prove "[p]roperty in herself, and a right of possession at the time of the conversion").

With the exception of Daniel's claims pertaining to conversion of cattle and fuel, we find that defendants were entitled to summary disposition. We first address the claim relating to cattle. Daniel asserted that he owned various cattle on the farm and that he had an agreement with Melvin for raising the cattle. In what appears to be, from the record, a separate trial court action, Daniel sought to establish his ownership over the cattle. The judge in that case ordered that the cattle be sold at auction, with the proceeds going to Melvin.[6] The order also stated that

---

[5] In his brief on appeal, Daniel cites, for the first time, MCL 600.2919, which pertains to damage or waste to land, or cutting down and/or carrying away any "grass, hay, or any kind of grain . . . ." Given that he never made a claim under this statute before the trial court, we could decline to consider this argument. Moreover, we find his citation to this statute does not change our analysis of this issue.

[6] In other words, these cattle were sold for Melvin's benefit, not for the benefit of defendants.

some of the crops present on the farm could be used to feed and maintain the cattle. There is no indication in the record that the dispute about the cattle had been resolved.

Daniel averred, and Catherine confirmed in her affidavit, that Catherine took home a calf that was born to one of the cows and raised it on her own. At a certain point, she had the calf slaughtered and butchered, averring that she kept the meat from the animal in order to recoup the costs she incurred in raising it. In other words, she does not deny that she took the calf for her benefit. She claims that she had the authority to do so because she confirmed, after speaking with Melvin, that Melvin owned the cow. However, we note that her conclusory affidavit about the animal's ownership, which purports to contain Melvin's hearsay statement, fails to account for the fact that there appears to have been an ongoing legal dispute between Daniel and Melvin about the ownership of the cattle. Under these circumstances, we find that there was a genuine issue of material fact as to whether Catherine converted cattle that belonged to Daniel. The trial court erred by granting summary disposition on this count as to Catherine.

We also find there was a genuine issue of material fact with regard to Daniel's claim that defendants converted to their own use fuel stored on Melvin's farm. Daniel averred that he purchased the fuel. While his affidavit contained some speculative hearsay statements concerning whether defendants used the fuel, Catherine's affidavit stated that "diesel fuel was used for Melvin Berg's tractor" at some point after Daniel was banned from the farm. In addition, Daniel averred that defendants confirmed to him that the fuel in the tanks had been depleted.[7] Viewing the evidence in a light most favorable to Daniel, the non-moving party, we find that there was a genuine issue of material fact as to whether defendants, who appeared to have been left in charge of the farm for Melvin, converted the fuel for their own use.

However, we find that Daniel has not demonstrated the existence of a genuine issue of material fact with regard to any of his remaining conversion claims. A majority of his claims involve his assertions that defendants converted his property by denying him access to Melvin's farm. However, we note that various court orders banned Daniel from the farm, and that Daniel never objected to the orders by attempting to remove the property he now claims was converted. In addition, Daniel fails to create a genuine issue of material fact concerning whether any of the defendants, if they converted any property, did so for their "own use" as is required by MCL 600.2919a(1). See *Aroma Wines & Equip, Inc*, __ Mich at __, slip op at 22. Indeed, he merely alleges that he was denied access in most cases. And even in the few claims where he alleges defendants used his property, his claims must fail. For instance, although he alleges that defendants converted certain wheat by harvesting it—a fact defendants do not deny—he fails to recognize that defendants averred, and Daniel did not refute as much, that the wheat was harvested, sold, and the proceeds given to Melvin and/or Melvin's conservator. Thus, there is no dispute that the wheat was not used or converted for defendants' own use; rather, it was done for Melvin. See *Aroma Wines & Equip, Inc*, __ Mich at __, slip op at 22 (explaining that statutory conversion requires that the converted put the property to his or her "own use."). Similarly, we

---

[7] Such confirmation could serve as an admission by a party-opponent and constitute admissible hearsay.

note that Daniel's claims that defendants converted his silage, corn, tarp, bags of soy meal, and potatoes, all of which were allegedly left on Melvin's property, fail for the same reason because he has never submitted any evidence indicating that defendants used those items.

With regard to Daniel's claims that defendants converted his hay that was stored on Melvin's property, Daniel relies on nothing more than hearsay statements to indicate that the hay was taken. Notably, he relies solely on his averments that "[p]eople have told me that they have seen trailers full of hay leaving the Berg Farm with Defendants." He also relies on his averment that "as reported by the conservator"[8] there were only a few bales of hay left in April 2013. Both of these averments contain hearsay for which Daniel has failed to articulate an exception, and for which we find none. He cannot rely on these inadmissible statements. See *Palazzola*, 223 Mich App at 155-156.

In sum, the trial court correctly granted summary disposition as to a majority of Daniel's conversion claims, but erred as to those two claims noted above.

## III. ATTORNEY FEES

Plaintiff also argues that the trial court improperly awarded $30,906.35 in attorney fees to Catherine and $27,839.75 in attorney fees to Munoz and Rebecca. "A trial court's findings with regard to whether a claim or defense was frivolous, and whether sanctions may be imposed, will not be disturbed unless it is clearly erroneous." *1300 LaFayette East Coop, Inc v Savoy*, 284 Mich App 522, 533; 773 NW2d 57 (2009).

Generally, absent an exception, each party in a civil dispute bears its own attorney fees. *Smith v Khouri*, 481 Mich 519, 526; 751 NW2d 472 (2008). However, MCR 2.114(F) provides that "a party pleading a frivolous claim or defense is subject to costs as provided in MCR 2.625(A)(2)." MCR 2.625(A)(2) provides: "In an action filed on or after October 1, 1986, if the court finds on motion of a party that an action or defense was frivolous, costs shall be awarded as provided by MCL 600.2591." Thus, "MCR 2.625(A)(2) provides that if the court finds that an action or defense is frivolous, it must award costs as provided by MCL 600.2591." *Yee v Shiawassee Co Bd of Comm'rs*, 251 Mich App 379, 407; 651 NW2d 756 (2002). MCL 600.2591(3)(a) provides:

> (3) As used in this section:
>
> (a) "Frivolous" means that at least 1 of the following conditions is met:
>
> (*i*) The party's primary purpose in initiating the action or asserting the defense was to harass, embarrass, or injure the prevailing party.
>
> (*ii*) The party had no reasonable basis to believe that the facts underlying that party's legal position were in fact true.

---

[8] Daniel did not produce this alleged report from the unnamed conservator.

(*iii*) The party's legal position was devoid of arguable legal merit.

The record indicates that the trial court granted defendants attorney fees under MCR 2.114(F) and that the court found that plaintiff's claims were frivolous because plaintiff's "legal position[s] w[ere] devoid of arguable legal merit" under MCL 600.2591(3)(a)(*iii*) based on its rationale for granting defendants' summary disposition motions. "Not every error in legal analysis constitutes a frivolous position." *Kitchen v Kitchen*, 465 Mich 654, 663; 641 NW2d 245 (2002). "[M]erely because this Court concludes that a legal position asserted by a party should be rejected does not mean that the party was acting frivolously in advocating its position." *Id*.

We reverse the trial court's award of attorney fees in this case. In order to be entitled to attorney fees pursuant to MCR 2.625 and MCL 600.2591, a party must be "the prevailing party. . . ." MCL 600.2591(1). Under MCL 600.2591(3)(b), a "prevailing party" is "a party who wins on the entire record." With regard to our decision to reverse the trial court's ruling in favor of defendants in certain regards, defendants can no longer be considered "the prevailing party" "on the entire record" and thus are no longer entitled to attorney fees. See *1300 LaFayette East Coop*, 284 Mich App at 534-535. Moreover, we find that the remaining claims were not so devoid of arguable legal merit so as to warrant an award of attorney fees. Accordingly, we reverse the trial court's award of attorney fees to defendants.

Affirmed in part, reversed in part, and remanded for further proceedings not inconsistent with this opinion. We do not retain jurisdiction.


/s/ Deborah A. Servitto
/s/ Jane M. Beckering
/s/ Mark T. Boonstra

-9-